UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Charles Jay Wolff

    v.                                Civil No. 06-cv-321-PB

New Hampshire Department of
Corrections, et al.

**REPORT AND RECOMMENDATION**

    Before the Court is Charles Wolff's motion for emergency injunctive relief (document no. 38). A hearing on the motion was held before me on August 1, 2007. On August 2, 2007, prior to making any ruling regarding injunctive relief, I directed the defendants to provide the Court with notification of: (1) what actions the prison would take to evaluate Wolff's medical condition and claims that he cannot tolerate the food provided to him, and (2) the remedy the prison would employ to provide Wolff with a diet that is religiously and medically appropriate, if it was determined that he could not tolerate the meals being provided to him (document no. 49). The defendants promptly responded to my Order (document no. 50). Plaintiff has requested that the hearing on his motion for injunctive relief be reconvened so that he might introduce evidence in response to the

defendants' written response to that Order (document no. 52). Wolff has also filed several motions seeking to have the Court hold the prison kitchen supervisor in contempt (document nos. 53-55, 58, 60 & 62). The defendants object to the plaintiff's motions (document no. 59). I address herein the motion for preliminary injunctive relief and the subsequently filed pleadings pending before the Court.

## Standard of Review

Preliminary injunctive relief is available to protect the moving party from irreparable harm, so that he may obtain a meaningful resolution of the dispute after full adjudication of the underlying action. See Jean v. Mass. State Police, No. 06-1775, 2007 WL 1793126, *2 (1st Cir. 2007). Such a situation arises when some harm from the challenged conduct could not be adequately redressed with traditional legal or equitable remedies following a trial. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996) (finding irreparable harm where legal remedies are inadequate); see also Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (explaining irreparable harm and its effect on the contours of preliminary

injunctive relief). Absent irreparable harm, there is no need for a preliminary injunction.

The need to prevent irreparable harm, however, exists only to enable the court to render a meaningful disposition on the underlying dispute. See CMM Cable Rep., Inc. v. Ocean Coast Props., 48 F.3d 618, 620-21 (1st Cir. 1995) (explaining the purpose of enjoining certain conduct as being to "preserve the 'status quo' . . . to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs."); see also Stenberg v. Cheker Oil Co., 573 F.2d 921, 925 (6th Cir. 1978) ("The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.").

A preliminary injunction cannot issue unless the moving party satisfies four factors which establish its need for such relief. See Esso Std. Oil Co. v. Monroig-Zavas, 445 F.3d 13, 17-18 (1st Cir. 2006) (discussing the requisite showing to obtain a preliminary injunction); see also Ross-Simons, 102 F.3d at 18-19 (explaining the burden of proof for a preliminary injunction). Those factors are: "(1) the likelihood of success on the merits;

(2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Esso Std. Oil, 445 F.3d at 18.  If the plaintiff is not able to show a likelihood of success on the merits, the remaining factors "become matters of idle curiosity," insufficient to carry the weight of this extraordinary relief on their own.  See id. (the "sine qua non of the four-part inquiry is likelihood of success on the merits").  Yet, "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." Ross-Simons, 102 F.3d at 19.

## Background

Charles Wolff testified at the hearing that he is an orthodox jew who requires a kosher diet.  The prison has been providing him, he says, with a kosher diet made up largely of prepackaged "shelf stable" kosher meals.  According to Rick Stacy, the prison kitchen supervisor who testified at the hearing, the prepackaged meals maximize the integrity of the kosher food, because they can be steamed in the package and

served sealed to inmates, which allows for the separation of kosher food from nonkosher food and appliances in the prison's kitchen. Wolff claims that he has refused to eat the shelf stable prepackaged meals, however, because he cannot physically tolerate them. Wolff testified that he suffers from extreme abdominal cramps and severe diarrhea every time he eats the kosher meals.

Wolff further testified that the diet he is provided at the prison fails to meet his medical needs. Specifically, he testified to being denied adequate snacks to maintain his blood sugar level although he is diabetic, and to being provided with food high in fat, although he has high cholesterol and coronary artery disease.

Wolff's other area of concern is that he is receiving inadequate pain medication. Wolff wants the Court to direct the prison medical staff to provide him with more ibuprofen and with Mylanta. Wolff testified that he needs a certain amount of ibuprofen and Mylanta to control his pain and stomach upset, but that his treating physician at the prison disagrees with him, and is therefore providing Wolff with ibuprofen at a lower dose. Wolff trestified that the pharmacy was unable to provide him with

Mylanta but that he does receive other medications for various gastrointestinal ailments. Finally, Wolff testified that he has a prescription for nitroglycerine, which is prescribed for him to take in the event that he feels symptoms of an impending heart attack. Wolff claims that his nitroglycerine has been taken from him by corrections officers for up to three and a half hours at a time when he has been placed into punitive segregation. Wolff did not testify that he had actually been harmed by this action, but expressed concern that the practice of taking his access to nitrogylcerine away for even a few hours endangers his life.

Stacy explained at the hearing that when an inmate is designated to have a kosher meal, the prison kitchen provides him with that meal. If an inmate refuses the shelf stable entree, he can still get the rest of his meal, but does not get an alternative entree. Stacy testified, however, that if an inmate has a medical pass that indicates he cannot tolerate certain foods, a religiously acceptable substitution of approximately the same nutritional value is made. Stacy testified that an inmate presenting a food tolerance issue to kitchen staff would be referred to health services to obtain an appropriate medical pass

as kitchen workers are not authorized or qualified to make medical decisions.

Wolff further complains that the inadequacies in his diet caused him to lose a dangerous amount of weight. Joyce Leeka, the Administrator of Health Information Management for the prison, testified that according to Wolff's medical records, he began his incarceration in 1996 at 144 pounds. Leeka testified that in 2000, he weighed 176½ pounds at his annual physical, and that he began gaining weight, reaching a high weight of 183 pounds in 2005.[1] Leeka testified that once his diet was controlled in order to treat his diabetes, Wolff's weight returned to the 140s. At his last weight check prior to the August hearing, Wolff weighed 148 pounds.

Additionally, Wolff expressed dissatisfaction with the amount of ibuprofen the doctors prescribed for him, and with the refusal of the pharmacy to provide him with Mylanta. Joyce Leeka testified, however, that while Wolff may have disagreed with some of the medical decisions made in his case, and therefore may not have received his preferred medications or dosages, that he was provided with a great deal of medical care, and at least fourteen

---

[1] Wolff claims that he has weighed as much as 230 pounds during his incarceration.

7

medications[2] to treat a myriad of conditions and complaints.[3] Leeka indicated that Wolff's medical records indicate that Mylanta has never been prescribed for him at the prison. The evidence also showed that there are medications that Wolff has refused to take, or has discontinued voluntarily, such as medication to treat his bipolar disorder. Leeka also testified that Wolff has been seen frequently by the medical personnel at the prison -- at least once a month and often more than that -- and referred to outside specialists or hospitals as necessary.[4]

After the August 1 hearing, I directed the prison to evaluate Wolff to determine whether or not he is able to tolerate

---

[2] At the time of the hearing, Wolff was being routinely provided with, among other things, ibuprofen for pain, immodium as needed for diarrhea, aspirin for his heart condition, two statin drugs for his coronary artery disease and to lower his cholesterol, Lipitor, another cholesterol-lowering drug, Prilosec to treat gastrointestinal ailments, and a multivitamin.

[3] Leeka testified that Wolff's prison diagnoses have included high blood pressure, post-traumatic stress disorder, type II diabetes (non-insulin dependent), extremely high cholesterol, peripheral neuropathy, memory loss, Cushing's syndrome, metabolic syndrome, adrenal gland disease, coronary artery disease, bipolar disease, gastrointestinal ailments, and prostate cancer.

[4] During his incarceration, Wolff has been treated medically and surgically at outside hospitals and by outside specialists for, among other things, prostate cancer, the removal of his adrenal gland, as well as for his coronary artery disease, which has required placement of two arterial stints.

the kosher meals being provided to him.  Defendants immediately responded with notice to this Court of a comprehensive plan to have Wolff monitored and evaluated to determine what, if any, adverse impact the diet he was receiving had on his health.  Further, the defendants arranged a consultation with an outside nutritionist, and obtained a commitment from the prison's medical director, Dr. Robert McLeod, to provide Wolff with whatever diet was necessary to insure that his nutritional, medical, and spiritual needs were being met.  Defendants' counsel is to be commended for his quick, thorough, and professional response to my order.

To implement this Court's directive, the prison placed Wolff in the prison's Health Services Center, in an isolation unit, for a period of seven days.  During that time, everything that Wolff ate and drank was monitored.  The food he received was recorded, and the food that remained after he ate was recorded.  During the week in isolation, Wolff ate the prepackaged shelf stable Kosher meals on four occasions, and refused to eat the rest of the Kosher meals offered to him.  On two occasions, when Wolff ate a Kosher meal, he complained of some cramping.  He also complained of having diarrhea on a number of instances, but medical staff at

the prison examined all of his bowel movements and determined that, aside from one occasion when a "scant" amount of loose stool was detected, all of Wolff's bowel movements during the week were firm, and were not affected by eating the prepackaged Kosher meals.

To address his assertion that he is losing dangerous amounts of weight, Wolff's weight was monitored daily during his seven-day stay in the Health Services Center.  Wolff did lose more than two pounds during his that week.  It appears, however, that he was provided with a reasonable amount of food, and that he refused much of the food he was offered.  Further, there is no evidence before the Court that his weight has dropped to a dangerous level.

## Discussion

As previously stated, in order to prevail on his motion for preliminary injunction, Wolff must demonstrate: (1) that he is likely to succeed on the merits of the claims underlying his action, (2) that he will suffer from irreparable harm if the injunction is not granted, (3) that the imposition on defendants if the motion is granted is outweighed by the necessity of the injunction, and (4) that the issuance of an injunction would not

unreasonably impact the public interest in this matter.  See Esso Std. Oil, 445 F.3d at 17-18.  The essential questions before me for consideration are whether or not Wolff will succeed on his underlying cause, and whether, upon succeeding, Wolff will be able to have meaningful redress for his injuries if no injunction issues.  See CMM Cable, 48 F.3d at 620-21.

In his underlying action, Wolff primarily complains that he has been denied a kosher diet consistent with his faith.  As a preliminary matter, I find that Wolff concedes that he is currently receiving a kosher diet consistent with his faith. Plaintiff did not introduce evidence at the hearing regarding any claims that he may have arising out of previous denials of a kosher diet.  To the extent that he alleges that he may, at some time during his incarceration, have been denied a kosher diet as a sanction for eating non-kosher foods, however, I will allow, as I did in my initial review of Wolff's complaint, that he may have stated a viable claim and will assume, without deciding, that he has stated sufficient facts, although he did not present additional evidence at the hearing on his likelihood of success, to enable me to find that he may succeed on the merits of his underlying claim.  The focus of the hearing was on the harm Wolff

alleges from ongoing actions of the defendants in denying him a nutritionally and medically adequate diet.

The evidence presented at the hearing, and submitted to the Court after the hearing, demonstrates that the prison has taken great pains to insure that Wolff is provided with a diet that meets the requirements of his religious faith, that is nutritionally adequate, and that meets his medical needs.  The fact that Wolff is prescribed a multivitamin, that he is frequently seen by physicians and other medical personnel, that he is provided with regular medication, and that his test results demonstrate that his diet is doing him no harm medically, clearly show that Wolff is not likely to suffer from irreparable harm if he is not provided with the frozen prepackaged kosher meals that he prefers to the shelf stable prepackaged meals that he is presently receiving.  While it is clear that Wolff does not want to eat the shelf stable meals, he has not presented evidence that counters the weight of the medical evidence showing that his body is not reacting adversely to the foods provided, or otherwise demonstrated that his nutritional and medical needs are not being met.

Further, the prison has taken the added step of referring Wolff to an outside nutritionist to determine the advisability of the foods with which he is presently provided.  Additionally, the prison has indicated its willingness to be responsive to Wolff's nutritional needs as they are made aware of such needs.  The evidence at the hearing demonstrated that much of the food Wolff claims is denied to him and causing him to lose weight is actually food that he has been offered and refused, not food that is being withheld from him by the defendants.  While it is entirely understandable that Wolff would like to be provided with food that is appetizing to him as well as nutritious, a diet is not unconstitutionally inadequate because it does not taste good.  The evidence before me, considered as a whole, indicates that what the defendants have provided suffices to meet Wolff's religious, nutritional and medical needs, even if it is unappealing to him.  Accordingly, I cannot find that Wolff has demonstrated any indication that his diet will cause him irreparable harm.

Wolff's claim that he is not being provided with adequate pain medication fares no better.  The prison demonstrated that Wolff is being provided with a substantial amount of medical

care, and that all of his medical concerns, including gastrointestinal ailments and pain, are currently being actively treated by prison medical staff. As is the case with the prepackaged meals, Wolff is not being provided with the medication regimen that he prefers. This, however, does not suffice to demonstrate that he will be irreparably harmed by the medical treatment he is receiving. Accordingly, I find that Wolff has failed to meet his burden of demonstrating irreparable harm if his injunction is not granted and I recommend that the motion for a preliminary injunction be denied.

## Motions for Contempt

In motions filed since the August hearing (document nos. 53-55, 58, 60 & 62), Wolff seeks a finding of contempt against prison kitchen supervisor Stacy for serving Wolff eggs and an order from this Court directing the prison kitchen staff, under Stacy's direction, to provide Wolff with donuts and danish for breakfast in lieu of eggs. Wolff further seeks a Court order prohibiting inmate kitchen worker James Keach from having any contact with Wolff's kosher food, prohibiting the prison from serving him eggs, and directing that he be fed in his cell so as to avoid contact with the kitchen staff.

Defendants object to Wolff's attempts to obtain contempt rulings. Defendants assert that they have not, to date, been subject to any order of this Court restricting any specific foods from Wolff's diet. Further, defendants argue that despite extensive attention from medical professionals and a dietician, there is no indication that Wolff has an allergy to eggs or that his medical condition precludes him from eating hard-boiled eggs.[5] Accordingly, defendants argue that there is no reason for this Court to order that Wolff not be served eggs. Further, because no such orders are currently in place, plaintiff's motions for contempt should be denied. Wolff, in response to defendants' objection to his previously filed motions for contempt, argues that an "agreement" entered into between this Court and Rick Stacy had the force of a court order, and that Stacy is therefore in violation of that order each time Wolff is served an egg by the kitchen staff.

At the preliminary injunction hearing, I opined that if Wolff's cholesterol was very high, that it would likely be

---

[5]Because Wolff has high cholesterol that is controlled by medication, the defendants concede that egg yolks are probably not the wisest food choice for him. However, defendants assert, nothing in Wolff's medical history is complicated by the ingestion of egg whites, and the yolks of hard-boiled eggs are easily set aside.

15

inappropriate to serve him eggs as part of a medically responsible diet.  At that hearing, Stacy did say that, if that were the case, something else could be substituted for eggs.  The evidence before the Court at this time, however, is that Wolff's cholesterol is very well-controlled with medication and that his diet, although possibly unappealing to Wolff, is not having an adverse impact on his cholesterol level.  Further, the evidence in this case is clear that defendants sent Wolff for a consultation with an outside nutritionist and agreed to provide him with whatever diet was medically indicated for him.

This Court did not order Stacy or anyone else at the prison not to serve Wolff any specific foods.  I understood and accepted Stacy's testimony at the hearing, as an expression of his willingness to substitute foods, if necessary, to create a nutritionally and medically sound Kosher diet to Wolff if such a substitution was necessary.  This Court is not a medical professional and I certainly had no intention of making a diagnosis in Wolff's case when I stated at the hearing that a daily serving of three eggs was generally considered to be contraindicated for those individuals who suffer from high cholesterol; in the same vein, my statements to Mr. Stacy were

not an order to him to discontinue the service of eggs without any professional medical opinion stating that such a discontinuation was advisable. My order, instead, was that the prison should evaluate Wolff's tolerance to his diet and create and implement a plan to make necessary changes if the diet was not sound (document no. 49). Because there was no existing order to be violated, I find that there was no contempt of court. Accordingly, the motions for contempt and to reconvene the hearing (document nos. 52, 54, 55, 58, 60 & 62) are denied.

## Conclusion

For the foregoing reasons, I recommend that the requested preliminary injunctive relief, as well as the contempt motions filed by plaintiff, be denied. Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See <u>Unauthorized Practice of Law Comm. v. Gordon</u>, 979 F.2d 11, 13-14

(1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge

Date:     October 17, 2007

cc:       Charles Jay Wolff, pro se
          Andrew Livernois, Esq.